UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JUDY HYMES GREEN, ET AL.                    CIVIL ACTION

VERSUS                                      NO: 08-792

CCS ENERGY SERVICES LLC, ET AL.             SECTION: R


**ORDER AND REASONS**

Before the Court is defendants Bordelon Marine, Inc. and Chevron USA, Inc.'s Motion for Summary Judgment (R. Doc. 51). For the following reasons the Court GRANTS the motion.

I.  **BACKGROUND**

This action arises out of the deaths of Clyde Green and Robert Lipton on December 2, 2007. Prior to their deaths, Green and Lipton were employed by Grand Isle Shipyards, Inc. (GIS), which is not a party to this action. On the date of the deaths, GIS was engaged by defendant Chevron USA, Inc. to perform tank cleaning work on the supply vessel M/V TERRY BORDELON. Chevron had chartered the TERRY BORDELON from the vessel's owner, defendant Bordelon Marine, Inc., and brought the vessel to

Venice, Louisiana for cleaning. After the vessel was moored to a dock at a facility owned and operated by defendant CCS Energy Services, the GIS employees were sent aboard to begin their work.

The details of the deaths remain uncertain. According to the complaints, Green and Lipton were inside the vessel's "mud tank," which is where the drilling mud was stored, when they were "overcome by toxic fumes." (Green Compl., R. Doc. 1-1 at ¶ 15; *see also* Lipton Compl., Civ. No. 08-1511, R. Doc. 1 at ¶ 14.) The complaints allege that dangerous levels of hydrogen sulfide gas were present in the tank at that time, having either been introduced via "recycled wash-down water" supplied by CCS, Chevron, and/or Bordelon or through some unknown means prior to the commencement of the cleaning operations. (*See* Green Compl., R. Doc. 1-1 at ¶¶ 19-22; Lipton Compl., Civ. No. 08-1511, R. Doc. 1 at ¶¶ 13-17.) Green and Lipton lost consciousness in the tank and passed away shortly thereafter.

Two sets of plaintiffs have filed complaints. Mr. Green's widow, Judy Green, filed a complaint in her individual capacity, as Green's personal representative, and on behalf of his estate. (*See* Green Compl., R. Doc. 1-1 at ¶ 2.) Mr. Lipton's two daughters, Tineka and Shonda West, filed a separate action in their individual capacities and as co-administrators of Lipton's estate. (*See* Lipton Compl., Civ. No. 08-1511, R. Doc. 1 at ¶¶ 3, 4, 18, 19.) The Court consolidated the two actions on May 1,

2008. (*See* R. Doc. 17.) The plaintiffs allege that various negligent acts committed by CCS, Chevron, and/or Bordelon permitted the toxic gas to be introduced into the mud tank and to remain undetected, thereby causing the deaths of Green and Lipton. (*See* Green Compl., R. Doc. 1-1 at ¶¶ 24-26; Lipton Compl., Civ. No. 08-1511, R. Doc. 1 at ¶¶ 17-19.) The plaintiffs seek compensatory damages for wrongful death and survival as well as punitive damages. (*See* Green Compl., R. Doc. 1-1 at ¶¶ 27-29; Lipton Compl., Civ. No. 08-1511, R. Doc. 1 at ¶¶ 18-20.) In addition, the defendants have filed cross-claims against each other for indemnity and contribution. (*See* R. Doc. 35; R. Doc. 37.)

On October 14, 2008, Chevron and Bordelon filed a motion for summary judgment, seeking to have the plaintiffs' claims and CCS's cross-claims against them dismissed. (R. Doc. 51.) In its memorandum in opposition, CCS requested additional time to discover the facts necessary to oppose summary judgment, which the Court granted. (R. Doc. 86.) CCS has now completed the necessary discovery and has filed a second memorandum in opposition. (R. Doc. 103.) The plaintiffs have adopted CCS's arguments by reference. (R. Doc. 104.)

**II. LEGAL STANDARD**

Summary judgment is appropriate when there are no genuine

issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

## III. DISCUSSION

Bordelon and Chevron ("the vessel interests") seek summary judgment on all of the claims against them. The plaintiffs and CCS have alleged that Green and Lipton's deaths were caused by the vessel interests' negligence. Section 905(b) of the Longshore and Harbor Workers Compensation Act grants covered maritime workers an exclusive remedy against a "vessel" for injuries caused by the negligence of the vessel. *See* 33 U.S.C. § 905(b). The Act defines "vessel" broadly to include both the physical vessel on which the worker was injured and also "said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). No party disputes that the decedents were maritime workers covered by the LHWCA or that Bordelon and Chevron are "vessels" within the meaning of the Act. Section 905(b) is therefore the exclusive means through which the plaintiffs may recover against Bordelon and Chevron for vessel negligence. *See McLaurin*, 529 F.3d at 289.

The Supreme Court has outlined three general duties that vessel owners and charterers owe to covered workers under section 905(b):

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the

> "active control of the vessel." The third duty, called the
> "duty to intervene," concerns the vessel's obligations with
> regard to cargo operations in areas under the principal
> control of the independent stevedore.

*Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994) (citing *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981)); *see also Kirksey v. Tonghai Maritime*, 535 F.3d 388, 391 (5th Cir. 2008). Although the principal cases discuss these duties in the context of a shipowner's relationship with stevedores and longshoremen, the Fifth Circuit has held that the rationale of those cases "clearly applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship." *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982); *see also Burchett v. Cargill, Inc.*, 48 F.3d 173, 178 n.3 (5th Cir. 1995).

### A. Turnover Duty

The shipowner has two distinct duties relating to the condition of the vessel at the time it is turned over to the stevedore. First, the shipowner must "exercise ordinary care under the circumstances" to ensure that the ship and its equipment are "in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety." *Kirksey*, 535 F.3d at 392. Second, "the owner owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it ... ." *Id.* Neither

-6-

duty encompasses dangers: "(1) [that are] open and obvious or (2) [that] a reasonably competent stevedore should anticipate encountering." *Id*. Although the Fifth Circuit has referred to this last requirement as the "open and obvious defense," *Kirksey*, 535 F.3d at 392, the Supreme Court has indicated that the plaintiff bears the burden of proving that the hazard could not have been anticipated by the stevedore. *See Howlett*, 512 U.S. at 106 ("[Plaintiff] must further demonstrate that the alleged hazard would have been neither obvious to nor anticipated by a skilled and competent stevedore at the discharge port."); *accord Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204, 1208 (9th Cir. 1989).

The vessel interests have argued that there is insufficient proof that they violated either the duty to warn or the duty to furnish a reasonably safe ship, which is all they must do to satisfy their initial burden on summary judgment. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. CCS and the plaintiffs must therefore show that the record contains sufficient evidence to enable a reasonable jury to return a verdict in their favor. *Lavespere*, 910 F.2d at 178.

In its most recent memorandum, CCS argues that the TERRY BORDELON was not reasonably safe at the time it was turned over to GIS because the ladder leading down to the port side mud tank was excessively slippery. CCS claims that the rungs of the

ladder were rusty and muddy, which caused Clyde Green to slip and fall back into the mud tank as he was ascending. According to CCS, Robert Lipton then descended into the tank to assist Green, and both men were overcome by the hydrogen sulfide gas. As CCS puts it, "the fall from the ladder began the chain of events" that resulted in the two deaths. (R. Doc. 103 at 4.) In support of this theory, CCS offers the deposition testimony of several of Green and Lipton's co-workers, who confirm that Green slipped and fell from the ladder. (*See, e.g.*, R. Doc. 103-2 at 3, 8.) One of the co-workers, Tyrone Reed, further testified that the rungs of the ladder "were all rusted up, mud on them, and they be slippery." (R. Doc. 103-2 at 32.) Finally, CCS argues that the lighting in the tank was poor, "leaving the GIS crew with difficulty discerning any defects in the ladder." (R. Doc. 103 at 5.)

The Court has concerns about whether this new theory of liability can properly be raised at such a late stage in the litigation. There are no allegations in the pleadings that can fairly be construed to state a claim based on the defective condition of the ladder, and it would prejudice the vessel interests to require them to defend a claim of which they had no notice. Even setting aside those concerns, however, summary judgment must be granted because the nonmoving parties have presented insufficient evidence in support of their theory.

Other than the unrebutted testimony that Green "slipped" as he was ascending the ladder, the only evidence offered by CCS is Tyrone Reed's testimony:

> Q: Do you recall what the rungs of the ladder going into the port tank were like?
>
> A: Yeah. They had oil-based mud on them.
>
> Q: Well, what I'm talking about is the -- how the rungs themselves are configured. Is it a spiky kind of nonskid piece of metal or how wide they are, what they look like. Is it that sort of grating-type material?
>
> A: The rungs? The rungs are round, about -- maybe about a quarter inch. A lot of them be all rusted up, mud on them, and they be slippery. Since we couldn't -- and since we couldn't use water as you squeegeeing, you can't wash the rungs off, because they don't want no water in the tank, period, until after you squeegee the majority of the product out that you could save.

(R. Doc. 119-4 at 2-3.)

The Court finds that this evidence is insufficient to create a genuine issue of material fact because, even after drawing all reasonable inferences in favor of the nonmoving parties, there is no indication in the record that the ladder suffered from any dangerous condition that a reasonably competent tank cleaner would not have expected to encounter. *See Kirksey*, 535 F.3d at 392. The shipowner "has a right to expect that the stevedore would perform with reasonable competence and see to the safety of the cargo operations," *id.* at 393 (quoting *Howlett*, 512 U.S. at 101) (internal quotation marks omitted), and is not required to protect independent contractors from dangers "inherent in the

carrying out of the contract." *Meserole v. M/V Fina Belgique*, 736 F.2d 147, 149 (5th Cir. 1984). Thus, when a vessel is turned over for repairs, the shipowner is generally under no duty to remove the hazards that are the intended object of the repairs or that are otherwise open and obvious. *See id.* at 148-49; *Stass v. American Commercial Lines, Inc.*, 720 F.2d 879, 882 (5th Cir. 1983); *Hill v. Texaco, Inc.*, 674 F.2d 447, 451-52 (5th Cir. 1982).

In this case, GIS was hired to clean the mud tank in the M/V TERRY BORDELON, a task that included "squeegee[ing]" the drilling mud and removing it from the tank. (R. Doc. 119-4 at 3.) The ladder leading into the tank was the obvious means of ingress to and egress from the tank. The vessel interests had a duty to furnish a reasonably safe ladder, but there is nothing in the record to suggest that they breached their duty in this case. No evidence in the record suggests that the ladder suffered from any latent structural defect. CCS has not presented evidence that the ladder broke, shifted abruptly, or otherwise failed. Furthermore, there is no evidence that the rust on the ladder impaired its structural integrity. CCS argues: "*If* the ladder was in a rusted or poor condition causing a dangerous situation for those persons entering and exiting the port tank, then Bordelon violated its turnover duty." (R. Doc. 103 at 5.) But speculation and unsubstantiated assertions "do not adequately

-10-

substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002). CCS's speculation about the structural integrity of the ladder is not sufficient to create a triable issue of fact.

As Tyrone Reed's testimony shows, there is some evidence in the record to suggest that drilling mud that had been tracked onto the ladder created a "slippery" condition. (R. Doc. 119-4 at 2-3.) But there is no evidence to suggest that the vessel interests were responsible for the hazardous condition or that a reasonably competent tank cleaner would not have expected to find drilling mud on the mud tank ladder. Drilling mud is precisely the substance that the tank cleaners were hired to remove. The tank cleaners knew that they would have to descend into the tank to "squeegee" the mud, and the evidence indicates that they expected to exit and re-enter the tank several times over the course of the cleaning operations. (*See* R. Doc. 103-2 at 9 ("Sometime you come up to take a break, or sometime you come up because you got to use the bathroom or something like that.").) In addition, the record indicates that the cleaners became covered in drilling mud while they were in the tank (*see* R. Doc. 103-2 at 29 (noting that Clyde Green was "full of that oil-based mud stuff" at the time he slipped from the ladder)) and that they knew they were not permitted to use water to wash off the ladder

-11-

(*see* R. Doc. 119-4 at 3).

All of this evidence suggests that the presence of drilling mud on the ladder and any resulting slipperiness was both an open and obvious hazard and one that a reasonably competent tank cleaner should have expected to encounter. CCS has made no effort to show that there is a triable issue in this regard. It argues that "[t]he shipowner still has a duty to turn over the ship in a condition in which expert and experienced stevedores can operate safely," but it presents no evidence or argument to suggest that an expert and experienced tank cleaner would not have been able to safely use a ladder connected to a mud-filled mud tank. To the extent that CCS is arguing that dim lighting conditions in the tank hid the hazardous condition of the ladder (*cf*. R. Doc. 103-2 at 32), CCS acknowledges, and the record evidence suggests, that GIS was responsible for providing the lighting. (*See* R. Doc. 103-1 at 5 n.1; R. Doc. 103-2 at 32; R. Doc. 119-3 at 3.) For all of these reasons, the Court finds that it would be unreasonable for a jury to conclude that "the alleged hazard would have been neither obvious to nor anticipated by a skilled and competent [tank cleaner] at the discharge port." *Howlett*, 512 U.S. at 106. Summary judgment must be granted for the vessel interests on the turnover duty claims.

**B. Active Control**

In addition to the turnover duty, "[i]t is also accepted that the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167; *see also Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34-35 (5th Cir. 1997); *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 16-17 (5th Cir. 1992). Here, however, neither the pleadings nor the summary judgment evidence contains facts that could fairly be taken to suggest that the vessel interests maintained active control over the mud tank area or the tank cleaning operations. Consequently, the plaintiffs and CCS have not stated a claim for breach of this duty, and the Court does not need to address it. (*See* Green Compl., R. Doc. 1-1; Lipton Compl., Civ. No. 08-1511, R. Doc. 1; CCS Answer and Claim, R. Doc. 37.)

**C. Duty to Intervene**

A vessel owner has the duty to intervene in the stevedoring operations when it "has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of 'obviously improvident judgment, has failed to remedy it.'"

*Greenwood v. Societe Francaise*, 111 F.3d 1239, 1248 (5th Cir. 1997). The shipowner's duty to intervene "is narrow and requires something more than mere shipowner knowledge of a dangerous condition." *Id.* at 1249 (citing *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)). "[F]or the expert stevedore's judgment to appear 'obviously improvident,' that expert stevedore must use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account." *Id.; see also Moore v. M/V ANGELA*, 353 F.3d 376, 391-92 (5th Cir. 2003).

The vessel interests argue that they had no duty to intervene because they were not aware that toxic gas had entered the mud tank:

> Claimants have no proof that [the vessel interests] had any knowledge of any alleged dangerous condition in the cargo hold, not do claimants have any proof that [the vessel interests] knew GIS or its employees were acting unreasonably at any time during the ship cleaning operations.

(R. Doc. 51-2 at 9.) In opposition, CCS suggests that one of Bordelon's crew members learned that hydrogen sulfide had entered the mud tank but failed to intervene and warn the tank cleaners. (R. Doc. 103 at 7.) The only evidence offered in support of this claim is a GIS crew member's testimony that a "boat engineer" appeared wearing protective breathing gear after the decedents has been removed from the mud tank and sent away in an ambulance.

-14-

(*See* R. Doc. 103-2 at 18-26.)  Apparently, CCS's theory is that the protective gear indicates that the engineer knew about the presence of the gas before it affected Green and Lipton.  But rather than articulate this theory or set out facts to support it, CCS poses its argument as a series of questions:

> When did this Bordelon crewmember first become aware of the smell?  Should the Bordelon crewmember have notified the GIS crew earlier of the smell?  Should the Bordelon crewmember have ordered everyone off the vessel at an earlier time?  All of these issues of fact remain unanswered.

(R. Doc. 103 at 7.)

These "unanswered" questions are plainly insufficient to defeat summary judgment.  The Federal Rules are clear that a party opposing summary judgment "must--by affidavits or as otherwise provided in this rule--set out *specific facts* showing a genuine issue for trial."  FED. R. CIV. P. 56(e)(2) (emphasis added).  "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."  *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002).  In this case, the only evidence presented is the testimony that an engineer appeared wearing protective gear after the decedents had already been taken away in ambulances.  While it is reasonable to infer from this evidence that the engineer eventually suspected that there was dangerous gas on the vessel, there is nothing to

support an inference that his suspicion was aroused *before* the decedents were overcome with the gas. The engineer could very well have been tipped off by the commotion on deck or by the presence of the ambulance. Because it would be impermissible for a jury to infer from such scanty evidence that the engineer learned about the toxic gas before the accident and failed to intervene, summary judgment must be entered for the vessel interests.

**IV. CONCLUSION**

For the foregoing reasons, Chevron and Bordelon's Motion for Summary Judgment (R. Doc. 51) is GRANTED. All claims against those parties are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this  9th  day of April, 2009.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE